**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | |
|---|---|
| KIMBERLY D. HARVEY, | CASE NO. 4:17-cv-00255-JED-GBC |
| Plaintiff, | |
| v. | (MAGISTRATE JUDGE COHN) |
| NANCY A. BERRYHILL,[1]<br>Deputy Commissioner for Operations,<br>performing the duties and functions not<br>reserved to the Commissioner of Social<br>Security, | REPORT AND RECOMMENDATION TO<br>DENY PLAINTIFF'S APPEAL |
| Defendant. | |

<u>**REPORT AND RECOMMENDATION TO DENY PLAINTIFF'S APPEAL**</u>

This matter is before the undersigned United States Magistrate Judge for a report and recommendation. Kimberly D. Harvey ("Plaintiff") seeks judicial review of the Commissioner of the Social Security Administration's decision finding of not disabled. As set forth below, the undersigned recommends to **DENY** Plaintiff's appeal and **AFFIRM** the Commissioner's decision in this case.

**I. STANDARD OF REVIEW**

To receive disability or supplemental security benefits under the Social Security Act ("Act"), a claimant bears the burden to demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period

---

[1] Ms. Berryhill, Deputy Commissioner for Operations, is leading the Social Security Administration, pending the nomination and confirmation of a Commissioner. Pursuant to Federal Rule of Civil Procedure 25(d), Deputy Commissioner for Operations Berryhill should be substituted as the defendant in this action. No further action need be taken to continue this suit by reason of the last sentence of the Social Security Act, 42 U.S.C. § 405(g).

of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); <u>accord</u> 42 U.S.C. § 1382c(a)(3)(A).

The Act further provides that an individual:

> shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy, regardless of whether such work exists in the immediate area in which he lives, or whether a specific job vacancy exists for him, or whether he would be hired if he applied for work.

42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B). Plaintiff must demonstrate the physical or mental impairment "by medically acceptable clinical and laboratory diagnostic techniques." 42 U.S.C. §§ 423(d)(3), 1382c(a)(3)(D).

Social Security regulations implement a five-step sequential process to evaluate a disability claim. 20 C.F.R. §§ 404.1520, 416.920; <u>Williams v. Bowen</u>, 844 F.2d 748, 750 (10th Cir. 1988) (setting forth the five steps in detail). "If a determination can be made at any of the steps that a plaintiff is or is not disabled, evaluation under a subsequent step is not necessary." <u>Williams</u>, 844 F.2d at 750. The claimant bears the burden of proof at steps one through four. <u>See</u> <u>Wells v. Colvin</u>, 727 F.3d 1061, 1064 at n.1. (10th Cir. 2013). If the claimant satisfies this burden, then the Commissioner must show at step five that jobs exist in the national economy that a person with the claimant's abilities, age, education, and work experience can perform. <u>Id.</u>

In reviewing a decision of the Commissioner, the Court is limited to determining whether the Commissioner has applied the correct legal standards and whether the decision is supported by substantial evidence. <u>See</u> <u>e.g.</u>, 42 U.S.C. § 405(g) ("court shall review only the question of conformity with such regulations and the validity of such regulations"); <u>Grogan v. Barnhart</u>, 399 F.3d 1257, 1261 (10th Cir. 2005). Substantial evidence is more than a scintilla but less than a preponderance and is such relevant evidence as a reasonable mind might accept as adequate to

support a conclusion. See id. Substantial evidence "does not mean a large or considerable amount of evidence, but rather 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" Pierce v. Underwood, 487 U.S. 552, 565 (1988) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)). The Court's review is based on the record, and the Court will "meticulously examine the record as a whole, including anything that may undercut or detract from the [Administrative Law Judge's ("ALJ's")] findings in order to determine if the substantiality test has been met." Id. The Court may neither reweigh the evidence nor substitute its judgment for that of the Commissioner. See Hackett v. Barnhart, 395 F.3d 1168, 1172 (10th Cir. 2005). Even if the Court might have reached a different conclusion, if supported by substantial evidence, the Commissioner's decision stands. See White v. Barnhart, 287 F.3d 903, 908 (10th Cir. 2002).

## II. BACKGROUND

### A.      Procedural History

On March 31, 2014, Plaintiff protectively applied for Disability Insurance Benefits ("DIB") under Title II of the Act, 42 U.S.C. §§ 416(i) and 423, and Supplemental Security Income ("SSI") payments under Title XVI of the Act, 42 U.S.C. § 1382c(a)(3). (Tr. 202-03, 206-13). Plaintiff has a limited education (Tr. 37-38, 243) and past work experience as a school helper, a daycare worker, and cafeteria server. (Tr. 63, 214-20, 233-40, 243, 249-52, 256-57). She alleged disability since October 26, 2012, (Tr. 41-42, 202) due to seizures, tremors, high blood pressure, diabetes, lupus, and liver disease. (Tr. 242, 282). An ALJ convened a hearing in January 2016 at which Plaintiff, with the assistance of her attorney, and a vocational expert ("VE") appeared and testified. (Tr. 29-72). On March 24, 2016, the ALJ rendered an unfavorable decision. (Tr. 8-24). Plaintiff requested review of the ALJ's decision. (Tr. 7). The Appeals Council denied Plaintiff's request, (Tr. 1-3)

making the ALJ's decision the Commissioner's final decision for purposes of judicial review. See 20 C.F.R. § 422.210(a). This action followed. Plaintiff, who was 44 years old on the date of the ALJ's decision, was a "younger person" as defined in the agency's regulations at all times relevant to this appeal. (Tr. 37, 202, 206).

### III. ISSUES AND ANALYSIS

On appeal, Plaintiff alleges three errors: (1) the ALJ failed to perform a proper determination at step five of the sequential evaluation process; (2) the ALJ failed to properly assess the medical source opinions; and (3) the ALJ failed to perform a proper[] credibility assessment. (Pl. Br. at 3, Doc. 13).

**A.      Residual Functional Capacity ("RFC") and the Hypothetical Question**

**1.      Performance of Other Work**

Plaintiff contends the ALJ erred at Step Five of the sequential evaluation process by finding Plaintiff could perform the jobs identified by the VE because the RFC limited her to simple work; she must not be around dangerous moving machinery; and she alleges she can only work part-time. (Pl. Br. at 3-6). In the decision, the ALJ reviewed the medical record and Plaintiff's testimony prior to evaluating the RFC:

> The claimant has the following severe impairments: diabetes mellitus insulin dependent, hypertension, history of seizures and anxiety disorder …

> Claimant reports she is unable to work due to seizures, tremors, high blood pressure, and diabetes. She reports problems with mood symptoms as well. Claimant testified at [the] hearing that she suffers from a combination of physical and mental conditions which render her disabled. She does not think she would be able to perform a job on a sustained basis; after the birth of her second child she tried to return to work. She finished 10th grade and is working on earning her GED. She has a driver's license but stopped driving three years ago. She receives food stamps in the amount of $357 per month and receives some help from her oldest daughter. She does the food shopping once a month; other than that, her daughter does the shopping. Some days it is hard to leave the house (maybe two days a week) …

Regarding claimant's mental health symptoms, she has a history of outpatient mental health treatment from August 15, 2011 through November of 2011, with resumption of treatment in June of 2013. In the past year, her GAF scores have ranged from 53-65, usually closer to 65. Her diagnoses are panic disorder with agoraphobia, major depressive disorder moderate and conversion disorder. Each treatment note includes the statement that "Patient is able to give informed consent, handle financial affairs, return to usual work, return to part-time work, live independently." Her mental status exam indicates at times she is anxious, has fair insight, mildly impaired judgment, is cognitively intact, and otherwise within normal limits. In January 2014, stuttering was noted but other notes indicate fluent speech. Claimant has remained in strictly outpatient therapy.

Records from OU Psychiatry Clinic dated September 24, 2013, note mood off and on [and] home situation strained because there [were] two families in one home. On March 20, 2014, the claimant's overall mood was good but she was still "stressing" due to being turned down for disability. She has a three-year-old daughter. Mental status exam was within normal limits with noted diagnoses of panic disorder and major depressive disorder with GAF of 65 …

As for the opinion evidence, State Agency consultant Dr. Stephen Scott, Ph.D., reviewed claimant's records on October 8, 2014, and opined her mental health conditions mildly to moderately limit her global functioning; she can understand, remember, and carry out simple and some complex instructions with routine supervision; can relate to supervision and limited number of coworkers on a superficial work basis; has moderate limitations in relating to the general public; and can adapt to a work environment.

Dr. Janet Rodgers, M.D. opined claimant should avoid unprotected heights and moving machinery (the only limitation she noted). The State Agency finding is consistent with the finding herein.

(Tr. 15, 18, 20). Thus, the ALJ reviewed Plaintiff's allegations regarding her limitations to simple work; dangerous moving machinery; and working part-time. From the record, the ALJ found Plaintiff had the RFC to perform:

a full range of light and sedentary work. She is unable to climb ropes, ladders, and scaffolds, and is unable to work in environments where she would be exposed to unprotected heights and dangerous moving machinery parts. She is able to understand, remember and carry out simple instructions in a work-related [] and is able to interact with coworkers and supervisors under routine supervision, but is unable to interact with the general public more than occasionally, regardless of whether that interaction is in person or over a telephone.

(Tr. 17). The ALJ formulated the RFC from consideration of all of the evidence. At the hearing, the VE testified such an individual could perform the jobs of hotel housekeeper, bakery worker, document scanner, and surveillance system monitor. (Tr. 65-66). Plaintiff argues the VE's testimony conflicted with the Dictionary of Occupational Titles ("DOT") because the jobs of document scanner and surveillance system monitor required a General Educational Development (GED) level 3 reasoning. (Pl. Br. at 3-6). See Document Scanner, DOT 249.587-018, 1991 WL 672349; Surveillance System Monitor, DOT 379.367-010, 1991 WL 673244.

Plaintiff's contention the ALJ erred in relying on the VE's testimony is not based on the regulations or the DOT, but instead implicates the Tenth Circuit's decision in Hackett v. Barnhart, 395 F.3d 1168 (10th Cir. 2005). In Hackett, the Tenth Circuit found a limitation to "simple and routine work tasks" seemed inconsistent with the demands of level 3 reasoning. (Id. at 1176). The Tenth Circuit remanded the case so the ALJ could address the "apparent conflict." Id. However, although the jobs of document scanner and surveillance system monitor contain a reasoning level of "3," the other two jobs cited by the VE, specifically bakery worker and hotel housekeeper, contain a reasoning level of "1," thus complying with Hackett. See Hackett, 395 F.3d 1176; see also Bakery Worker, 524.687-022, 1991 WL 674401 and Hotel Housekeeper, 323.687-014, 1991 WL 672783.

Plaintiff further argues the ALJ erroneously found she could perform the job of bakery worker because the DOT description of this job conflicts with a restriction to no exposure to dangerous moving machinery. While the description of this job requires "observ[ing] cakes moving under automatic topping shaker and cake cutting machine to ensure uniform topping application and cutting" and "occasional" exposure to "moving mechanical parts," this does not necessarily mean it is "dangerous moving machinery." DOT No. 524.687-022, 1991 WL 674401.

The Northern District of Oklahoma has considered whether the job of bakery worker requires proximity to dangerous equipment or moving mechanical parts:

> Plaintiff argues that the job of bakery worker requires "occasional" proximity to moving mechanical parts, hot ovens, and other dangerous equipment which conflicts with the RFC limitation of having the ability to "feel" only occasionally with her upper extremities. The DOT description for the bakery worker job identified by the vocational expert is as follows:
>
> > Performs any combination of the following tasks in preparation of cakes along conveyor line: Reads production schedule or receives instructions regarding bakery products that require filling and icing. Inspects cakes moving along conveyor to detect defects and removes defective cakes from conveyor to reject bins. Positions cakes on conveyor for application of filling or icing by machine, observes filling or icing application to ensure uniform coverage, and places additional cake layers on coated layers, depending on number of cake layers in product. Observes cakes moving under automatic topping shaker and cake cutting machine to ensure uniform topping application and cutting. Smooths iced edges of cake, using spatula, and moves decorating tool over top of designated cakes to apply specified appearance. Notifies supervisor of malfunctions.
>
> DOT No. 524.687–022, 1991 WL 674401. Contrary to Plaintiff's assertion, the RFC did not include any restriction on the ability to be near ovens or dangerous equipment. Exposure to hot pans, hot ovens, or other dangerous equipment is not within the job description of bakery worker. In fact, the DOT description specifies that exposure to extreme heat is "not present—activity or condition does not exist for the job." 1991 WL 674401. The court finds there is no merit to Plaintiff's contention that the bakery worker job is precluded by the RFC.
>
> > The court finds there is no conflict between the DOT descriptions of the designated jobs and the RFC restrictions of superficial and incidental work-related interaction with co-workers, supervisors, no significant public interaction, or feeling occasionally with the upper extremities.

Baker v. Colvin, No. 14-CV-371-FHM, 2015 WL 5775227, at *3 (N.D. Okla. Sept. 29, 2015).

However, even if Plaintiff was precluded from the job of bakery worker, document scanner, and surveillance system monitor, she could still perform the job of hotel housekeeper.

Plaintiff contends she cannot perform the job of hotel housekeeper because the providers at OU Psychiatry Clinic noted after each treatment: "Patient is able to give informed consent,

handle financial affairs, return to usual work, return to part-time work, live independently." (Pl. Br. at 5) (citing Tr. 513, 541, 546, 557-58, 563, 568, 573, 578, 661, 667, 673).

At her initial visit in August 2011, OU Psychiatry Clinic noted Plaintiff could return to her usual work, without mention of full-time or part-time: "Patient is able to give informed consent, handle financial affairs, return to usual work, live independently." (Tr. 513). From July 2013 to June 2014, the OU Psychiatry Clinic noted: "Patient is able to give informed consent, handle financial affairs, return to usual work, return to part-time work, live independently." (Tr. 541, 546, 557-58, 563, 568, 573, 578, 661, 667, 673).

From July 2013 to June 2014, OU Psychiatry Clinic noted Plaintiff could "return to usual work, return to part-time work." OU Psychiatry Clinic did not state Plaintiff could not perform full-time work, and at the initial visit in August 2011, the clinic made no mention of part-time work. Moreover, the state agency physicians and psychologists reviewed the evidence, including the opinions Plaintiff could return to part-time work, and found Plaintiff could perform full-time work with limitations. (Tr. 75-86, 102-14). In July 2014, a state agency physician said Plaintiff had no exertional, postural, manipulative, visual, or communicative limitations, but must avoid all exposure to hazards, such as machinery and heights. (Tr. 75-86). In October 2014, Dr. Rodgers reviewed the evidence and assessed limitations consistent with the prior state agency physician's opinion. (Tr. 102-14). In July 2014, Dr. Jacobson found Plaintiff could perform full-time work doing simple and complex tasks but could not deal directly with the public. (Tr. 75-86). In October 2014, Dr. Scott said Plaintiff could do simple and some complex full-time work and could adapt to a work environment. (Tr. 102-14). The ALJ found that the opinions of the state agency physicians and psychologists were consistent with the RFC. (Tr. 20). In a case from the District Court of Kansas, the court considered a plaintiff's allegation of inability to work full-time:

Plaintiff also contends that the ALJ also erred in not explaining "why he did not adopt Dr. Milner's opinion that Plaintiff was not capable of full-time work." But this stretches the record opinion too far. Dr. Milner testified that Plaintiff was "able to work, at least part time." She explained that Plaintiff was "capable of working," but stress may affect Plaintiff's heart rate and social anxiety may affect her work performance. The ALJ accounted for this opinion by restricting Plaintiff to work involving only limited contact with the public which is as stress-free as possible.

Lee v. Colvin, No. 12-2259-SAC, 2013 WL 4549211, at *7 (D. Kan. Aug. 28, 2013). Similarly, in this case, OU Psychiatry Clinic did not make any statement Plaintiff was "disabled," or could not work full time (see Tr. 513, 541, 546, 557-58, 563, 568, 573, 578, 661, 667, 673), and the ALJ accounted for Plaintiff's limitations established in the record by limiting her to work with simple instructions and no public contact. (Tr. 17).

Thus, any arguable deficiency would be harmless, at most, and would not have changed the outcome. See Raymond v. Astrue, 621 F.3d 1269, 1274 (10th Cir. 2009) (even assuming two of three jobs relied on by the ALJ were erroneous, the court affirmed the ALJ's decision where substantial evidence showed the claimant could do the third job, and the job existed in significant numbers in the national economy). See also Vititoe v. Colvin, 549 F. App'x 723, 729-30 (10th Cir. 2013) (citing Shinseki v. Sanders, 556 U.S. 396, 409-10 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination."). "Our review of the record indicates that the ALJ's question adequately included the limitations that she found were supported by medical record. That record, along with the VE's testimony on existing jobs, provided substantial evidence to support the ALJ's step-five determination." Talamantes v. Astrue, 370 F. App'x 955, 959 (10th Cir. 2010) (unpublished).[2]

---

[2] 10th Cir. R. 32.1 provides that "[u]npublished opinions are not precedential, but may be cited for their persuasive value."

**B.     Weight to Medical Evidence and the RFC**

**1.     Opinions of State Agency Physicians and Dr. Wade**

Plaintiff contends the ALJ erred in assessing the medical source opinions by failing to state

the weight he assigned to the state agency opinions and how he derived that weight. (Pl. Br. at 6-

7). In the decision, the ALJ made the following findings regarding the state agency doctors:

> As for the opinion evidence [on October 8, 2014] State Agency consultant
> Dr. Stephen Scott, Ph.D., reviewed claimant's records … and opined her mental
> health conditions mildly to moderately limit her global functioning; she can
> understand, remember, and carry out simple and some complex instructions with
> routine supervision; can relate to supervision and limited number of coworkers on
> a superficial work basis; has moderate limitations in relating to the general public;
> and can adapt to a work environment.
>
> [On October 8, 2014] "Dr. Janet Rodgers, M.D. opined claimant should
> avoid unprotected heights and moving machinery (the only limitation she noted).
> The State Agency finding is consistent with the finding herein."

(Tr. 20). Therefore, the ALJ found the opinion consistent with the RFC. The Tenth Circuit has

found it unnecessary to remand for further weight if the RFC is generally consistent with the

opinion, or the RFC is more favorable to the plaintiff than the opinion:

> It is the ALJ's duty to give consideration to all the medical opinions in the
> record. He must also discuss the weight he assigns to such opinions." Keyes–
> Zachary v. Astrue, 695 F.3d 1156, 1161 (10th Cir. 2012)). But an ALJ's error in
> failing to weigh a medical opinion can be harmless. If the ALJ's RFC is "generally
> consistent" with the findings in an opinion, or if the RFC is "more favorable" to the
> claimant than the opinion's findings, then "[t]here is no reason to believe that a
> further analysis or weighing of [the] opinion could advance [the claimant's] claim
> of disability." Id. at 1163. In such a case, the error is harmless because the claimant
> cannot show that she was prejudiced by the ALJ's failure to give greater weight to
> the opinion. See id. at 1162–63.

Wilson v. Colvin, 541 F. App'x 869, 871 (10th Cir. 2013). Similarly, in this case, the ALJ

formulated the RFC with limitations consistent with, or more favorable than, the findings of the

state agency physicians. The failure to specify particular weight does not warrant remand, and if

there was any error, it would be harmless. See Vititoe v. Colvin, 549 F. App'x 723, 729-30 (10th

Cir. 2013) (citing Shinseki v. Sanders, 556 U.S. 396, 409-10 (2009) ("[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination.").

Plaintiff also contends the ALJ ignored the opinion of Dr. Wade. (Pl. Br. at 8). In the decision, the ALJ noted:

> On February 12, 2013, claimant reported [to Dr. J. Wade, M.D., neurologist] she has seizure activities due to not taking medications.
>
> On March 1[2], 2013, claimant reported she was now on Keppra and had no seizure activities since the Super Bowl (claimant did not take her medication during the Super Bowl).
>
> On May 28, 2013, claimant followed-up and was now on Keppra. She reported having one partial complex seizure per week.
>
> On July 2, 2013 … claimant reported having no seizures since last visit. Exam was normal.
>
> On March 11, 2014 … [s]he was not currently having seizures …
>
> [On April 7, 2014, Dr. Wade] completed a treating physician seizure description form and noted type of seizures as "generalized seizures." He noted she has 1-2 seizures per month. She takes Keppra 500 and her last EEG was performed on July 14, 2011, with her last visit with him on March 11, 2014. This is the extent of the report and it is rather unremarkable …
>
> On June 2, 2015, Dr. Wade had noted claimant's pseudo seizures were manageable while taking Clonazepam. "She feels more comfortable on the medicine and states overall she is doing better" …
>
> On October 7, 2015, Dr. Wade, treating neurologist, noted chief complaint of "pseudo seizures." he noted there had been only two events over the past month. She had done well on Clonazepam and had no other side effects from the medication. He recommended continuation of Clonazepam and continued exercise …

(Tr. 20). Therefore, the ALJ reviewed the records from Dr. Wade, but as he gave no functional restrictions, the ALJ was not obligated to assign weight to the records. The Tenth Circuit analyzed this issue in the Duncan case:

> Ms. Duncan does not point to medical opinions of Dr. DePaula regarding work-related limitations attributed to the impairments he diagnosed or the placement of any significant exertional restrictions … Given that the ALJ did not

reject the medical impairments found by Dr. DePaula and there were no medical opinions regarding Ms. Duncan's work-related functional limitations, there was no opinion on such matters by Dr. DePaula for the ALJ to weigh.

Duncan v. Colvin, 608 F. App'x 566 at 574 (10th Cir. 2015). As in this case, since Dr. Wade did not assess any work-related limitations, the ALJ considered the records but did not need to assign them any weight.

### 2.   The RFC and Plaintiff's Diagnoses

Plaintiff also contends the RFC failed to account for excessive breaks, lessened productivity or pace, and missing work due to seizures, conversion disorder, convulsive disorder, and pseudo-seizures. (Pl. Br. at 5-6, 8). In the decision, the ALJ reviewed the record prior to formulating the RFC:

> Claimant reports multiple physical conditions including seizures and head tremor. Records dated December 10, 2010, note claimant had been positive for meth and notation was made of + for methamphetamine with syncope versus "seizure."
>
> On January 10, 2011, claimant reported history of head tremor since October of 2011. She was in her 7th month of pregnancy when this occurred. She has the tremors primarily when she closes her eyes. On November 22, 2010 and June 22, 2011, MRI of the brain was normal.
>
> On June 3, 2011, claimant reported having a tonic clonic seizure the previous Tuesday, lasting almost 5 minutes and witnessed by her friend without any tongue bite, urinary or bowel incontinence.
>
> On July 14, 2011, claimant was awake and electroencephalogram was within normal limits. There was no evidence of any seizure activity.
>
> On September 23, 2011, claimant reported no seizure activity. Overall, she was feeling much better and going outside the house more now that the weather was cooler. She enjoys time with her daughter and denied any history of depression. She reported feeling as though her seizure activity was well-controlled.
>
> On October 14, 2011, claimant reported her seizures were stable and she had experienced no seizure activity since July of 2011 …

> [O]n January 20, 2016 … [c]laimant presented to Physician's Assistant Mr. Michael Montague … [who] noted assessment of conversion disorder[3] with seizures, fatty liver, joint pain in both ankles, long-term use of insulin, hypertension, knee joint pain and diabetes mellitus under control.

(Tr. 19, 20). Thus, the ALJ reviewed the records of Plaintiff's diagnoses. As to Plaintiff's arguments the RFC failed to include an allotment due to excessive breaks, lessened productivity or pace, and missing work due to seizures, Plaintiff does not present evidence to support these allegations, and Plaintiff does not point to records specifying Plaintiff needs these accommodations. As for missing work due to seizures, the ALJ noted many instances where her seizures were under control with medication. (Tr. 19-20).

### a.      Diagnoses of Conversion Disorder and Pseudo-Seizures

Plaintiff acknowledges EEG evidence was negative but cites her mental health treatment, with a concurrent diagnosis of conversion disorder and pseudo-seizures. (Pl. Br. at 8) (citing Tr. 20, 370, 391, 396, 436, 509, 513, 518, 522, 534, 536, 539-40, 549, 556, 559, 563-64, 573, 576, 582, 584, 596, 605, 610, 617, 621, 641, 644, 649, 656, 662, 667, 673, 687-88, 693). The records cited by Plaintiff are summarized as follows, to the extent they are not duplicative:

> [On August 15, 2011, Plaintiff presented to Thomas Horn, D.O. at the psychiatry clinic]. She reports first having a "seizure" when she went to her OBGYN nine months ago when she was laying back and being examined. She denies any previous convulsive episodes before her pregnancy. She says they told her it was a syncopal episode. She reports having normal MRI of [the] head and normal EEG. She has been seen by [a] neurologist for poor balance. She was told she had essential tremor. She will see the cardiologist tomorrow for evaluation of syncope

---

[3] Conversion disorder [DSM-IV] a mental disorder characterized by conversion symptoms (loss or alteration of voluntary motor or sensory functioning suggesting physical illness, such as seizures, paralysis, dyskinesia, anesthesia, blindness, or aphonia) having no demonstrable physiological basis and whose physiological basis is suggested by (1) exacerbation of symptoms at times of psychological stress, (2) relief from tension or inner conflicts (primary gain) provided by the symptoms, or (3) secondary gains (support, attention, avoidance of unpleasant responsibilities) provided by the symptoms ... (See Conversion Disorder, 549, Dorland's Illustrated Medical Dictionary (32nd Ed. 2012)).

13

… She has been taking Dilantin for the past three weeks – denies any convulsive episodes since starting this …

Diagnoses

Axis I:         Rule out Conversion Disorder

Axis III:       seizure disorder? migraine HA? HTN DMII resting tremor

Axis V:        Current GAF 75

…

[On September 23, 2011, Plaintiff presented to Dr. Horn at the psychiatry clinic]. She reported no current psych medications … [and] no seizure activity since last visit, she is looking forward to going back to work as assistant cook at the school …

Diagnoses

Axis I:         Rule out Conversion Disorder

Axis III:       ? seizure disorder, tremor

Axis V:        Current GAF 70

…

[On November 28, 2011, Plaintiff presented to Dr. Horn at the psychiatry clinic]. She reported no current psych medications. She takes Ativan and Dilantin regularly as prescribed by PCP and neurology … Patient reports no seizure activity since last visit … She has decided not to return to work because she feels her balance is poor when she is on her feet for long periods, describes having syncopal episodes while in line at the grocery store in the past. She reports balance was tested by neurology and no deficits were observed … Patient complains of stutter which started about one year ago when baby was born, worse when in groups of people …

Diagnoses

Axis I:         Rule out Conversion Disorder
               Rule out Social Phobia

Axis IV:       Patient has problems with occupational.

Axis V:        Current GAF 65

…

14

[On August 21, 2012, Plaintiff presented to St John Medical Center for a seizure] … patient was in court deposition when she "slid out of the chair and laid on the floor" …

[Plaintiff presents] after having seizure while at [the] lawyer's office. Patient reports history of seizures in past and on Dilantin, but [she] admits to not taking.

…

[On February 3, 2013, Plaintiff presented to St John Medical Center for a seizure] … [EMS] states Patient had seizure-like activity prior to arrival that was resolved with painful stimuli …

She takes Dilantin for her seizures. She admits to being noncompliant [with] her Dilantin …

…

[On June 18, 2013, Plaintiff presented to Yujean Han, D.O. at the psychiatry clinic]. She was previously [] seeing Dr. Horn in 2011 for seizure disorder and social phobia … Patient reports she has seizures activity when she is put on the spot or in crowds … She reports she has seizures when anxiety increases. Reports this occurs daily and out of the blue. She avoids driving and public places. This started about 2 years ago after the birth of her daughter. Reports she has "stress seizures" once weekly depending on stress …

Diagnoses

Axis I:        Panic Disorder with Agoraphobia
               Major Depressive Disorder Single Episode Moderate
               Rule out Conversion Disorder

Axis III:      Resting Tremor, Diabetes Type II

Axis IV:       Patient has problems with primary support group, social
               environment, occupational, economic.

Axis V:        GAF 55

…

[On May 22, 2013, Plaintiff presented to St John Medical Center for a seizure]. Patient reportedly had two witnessed seizures while at Morton Clinic today. Physician on scene not able to describe seizure. Patient had facial twitching episode and shaking that was spontaneously stopped with sternal rub. Patient takes Keppra …

Patient has a history of seizure. The patient was switched from Dilantin to Keppra two months ago. Patient had a generalized tonic-clonic seizure while she was taking her daughter to the doctor …

Disposition:   Discharged

Counseled:   … Patient is to follow up with Dr. Wade. Increase the patient's Keppra from 500 [mg] twice daily to 750 mg twice daily.

…

[On July 23, 2013, Plaintiff presented to Katrina Crader, M.D. at the psychiatry clinic]. She was previously seen by Dr. Horn in 2011 for seizure disorder and social phobia. Last seen one month ago. She just moved out of her house 2/2 foreclosure. She is living with her brother. It is difficult at times … She had a small seizure in my office and started crying right after we discussed the cause of her seizures. She talked during her seizure. She then acted postictal intermittently. When it came time to leave my office, she acted "woozy" and lay down on the floor …

Diagnoses

Axis I:   Panic Disorder with Agoraphobia
Major Depressive Disorder Single Episode Moderate
Rule out Conversion Disorder

Rule out Social Phobia

Axis III:   ? of Seizure Disorder, Resting Tremor, Diabetes Type II

Axis IV:   Patient has problems with economic, housing.

Axis V:   GAF 65

…

[On August 20, 2013, Plaintiff presented to Dr. Crader at the psychiatry clinic]. No seizures since she was last in this office …

Goals for Treatment

Goal 1:   Reduction in pseudo seizures
Goal 1 Progress:   Good

…

Impression and Recommendations:

Problem 1:   Major Depressive Disorder Single Episode Moderate

16

Assessment:          Improved

…

Problem 2:           Panic Disorder with Agoraphobia
Assessment:          Unchanged
1.  Patient meets criteria for panic disorder
2.  Medications as above
3.  Will continue clonazepam as already prescribed
4.  RTC as above


Problem 3:           Rule out Conversion Disorder
Assessment:          Improved

She says that the last pseudo seizure was because I "left her alone for too long."
She has not had a pseudo seizure since. (Note: I was waiting to check out with my
attending [physician].)

…

[On September 24, 2013, Plaintiff presented to Dr. Crader at the psychiatry clinic]
… She will be monitored via EEG to see if she has real seizures. Home situation is
strained because there are two families in one house … One pseudo seizure at the
house about a week ago. Says her blood sugar was high. She felt a little tired and
confused afterwards. Says propranolol helps her feel calmer …

Diagnoses

Axis I:        Panic Disorder with Agoraphobia
               Major Depressive Disorder Single Episode Moderate
               Conversion Disorder
               Rule out Social Phobia

Axis III:      Hypertension, Pruritus, ? of Seizure Disorder, Resting Tremor,
               Diabetes Type II

Axis IV:       Patient has problems with social environment, economic, housing.

Axis V:        GAF 65

…

[On March 20, 2014, Plaintiff presented to Dr. Crader at the psychiatry clinic] …
She has been turned down for disability. Daughter is having absence seizures …
Seizures only get set off by being outside of the house and around people, and
happen once per week …

17

Diagnoses

Axis I:        Panic Disorder with Agoraphobia
               Major Depressive Disorder Single Episode Moderate
               Conversion Disorder
               Rule out Social Phobia

Axis III:      Hypertension, Pruritus, Resting Tremor, Diabetes Type II

Axis IV:       Patient has problems with primary support group, economic.

Axis V:        GAF 65

…

[On January 27, 2015, Plaintiff presented to St John Medical Center for a seizure] … The seizures were witnessed by her daughter while the patient was sitting in a waiting room [prior to arrival] … when she "started shaking all over" and was unresponsive during this time. Afterwards, the patient was able to stand up and start walking out of the waiting room. She then exhibited another episode of seizure-like activity that was similar to the first. Each episode lasted for about one minute. The patient seemed confused initially afterwards. No injury. No loss of bowel or bladder control. The patient was taken off of her Keppra four weeks ago by her neurologist [Dr.] Wade. States that she was told her seizures were "pseudo seizures." Not currently on any anti-epileptics. Denies increased frequency in her seizures but states they seem worse …

Condition:     Stable

Disposition:   Discharged to home

…

[On August 6, 2015, Plaintiff presented to John P. Laurent, M.D. at the psychiatry clinic] … reports things have been going well …

Conversion/pseudo seizure: report recently being taken off of Keppra and was told she has pseudo seizures by her neurologist. Reports she had non-epileptiform seizure while in a therapy session with Dr. Kursh … Provided psycho-education about epileptic versus non-epileptiform seizure activity …

Problem 1:           Major Depressive Disorder Single Episode Moderate
Assessment:          Unchanged

…

Problem 2:           Panic Disorder with Agoraphobia
Assessment:          Unchanged

…

Problem 3:        Conversion Disorder
Assessment:       Unchanged

…

Patient reports her neurologist told her she had psychogenic non-epileptiform seizures …

Problem 4:        Social Phobia
Assessment:       Unchanged … poor compliance with Zoloft, plan to change
                  to Prozac weekly …

…

[On October 7, 2015, Plaintiff presented to Dr. Wade, the neurologist] … with a chief complaint of pseudo seizures. There ha[ve] only been two events over the past month. She has done well on Clonazepam. She's had no other side effects from the medication …

her pseudo seizures are manageable while taking Clonazepam. She feels more comfortable on the medicine and states overall, she is doing better …

(Tr. 509, 513-16, 518, 520-22, 534, 536, 539, 541, 545, 548-49, 556, 558, 571, 573, 605-06, 610, 613, 617, 621, 646-47, 649-50, 687-88.) From the medical evidence cited by Plaintiff, none of the records found she could not return to work despite her limitations. Moreover, from the record dated October 7, 2015, the neurologist, Dr. Wade, noted there had only been "two [pseudo-seizure] events over the past month. She has done well on Clonazepam. She's had no other side effects from the medication." (Tr. 687). Dr. Wade concluded "her pseudo-seizures are manageable while taking Clonazepam. She feels more comfortable on the medicine and states overall, she is doing better." (Tr. 688). Finally, the state agency psychologist reviewed the records and found Plaintiff's allegations not disabling. On October 8, 2014, Dr. Scott opined her mental health conditions mildly to moderately limit her global functioning; she could understand, remember, and carry out simple and some complex instructions with routine supervision; could relate to supervision and limited

number of coworkers on a superficial work basis; had moderate limitations in relating to the general public; and could adapt to a work environment. (<u>See</u> Tr. 20). Therefore, substantial evidence supports the ALJ's decision finding Plaintiff could perform work, notwithstanding a diagnosis for conversion disorder / pseudo-seizures.

**C.      Credibility Analysis**

**1.      Plaintiff's Activities**

Plaintiff states the ALJ failed to perform a proper credibility determination. (Pl. Br. at 10-11). The ALJ reviewed the record to evaluate Plaintiff's credibility:

> The [ALJ] does not find claimant fully credible regarding her limitations. Regarding activities of daily living, claimant reports she takes care of her three-year-old daughter. She cares for [her]self, monitors her blood sugar, prepares meals, does housework, goes out alone, manages some finances, reads, spends time with others on the phone and goes to church. She prepares meals on a daily basis. She does a little cleaning, folding clothes and sweeping. When she is having a good day, she will take a walk by herself. Additionally, the record documents over a lengthy period of time that claimant's seizures are well-controlled with medication. Accordingly, the [ALJ] finds claimant is more than capable of performing the range of work set forth herein.

(Tr. 21). The ALJ reviewed Plaintiff's activities prior to making the credibility finding. Plaintiff states the ALJ failed to articulate specific reasons or perform a discussion of the credibility factors under 20 CFR §§ 404.1529; 416.929. (Pl. Br. at 3). However, the code does not require a factor by factor discussion. <u>See</u> <u>Keyes-Zachary v. Astrue</u>, 695 F.3d 1156, 1167 (10th Cir. 2012) ("But so long as the ALJ sets forth the specific evidence he relies on in evaluating the claimant's credibility, he need not make a formalistic factor-by-factor recitation of the evidence. Again, common sense, not technical perfection, is our guide.")

Although recently the Social Security Administration has eliminated the use of the term "credibility" from the agency's sub-regulatory policy, the agency continues to evaluate a disability claimant's symptoms using a two-step process:

First, we must consider whether there is an underlying medically determinable physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms, such as pain. Second, once an underlying physical or mental impairment(s) that could reasonably be expected to produce an individual's symptoms is established, we evaluate the intensity and persistence of those symptoms to determine the extent to which the symptoms limit an individual's ability to perform work-related activities for an adult ...

Soc. Sec. Ruling ("SSR") 16-3p; Titles II & XVI: Evaluation of Symptoms in Disability Claims, 2016 WL 1119029 at 2 (Mar. 16, 2016) (superseding SSR 96-7p; Policy Interpretation Ruling Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 1996 WL 374186 (July 2, 1996)).[4]

At step one of the process, "[a]n individual's symptoms ... will not be found to affect the ability to perform work-related activities for an adult ... unless medical signs or laboratory findings show a medically determinable impairment is present." Id. at 3. At step two, the ALJ may consider, among other things, a number of factors in assessing a claimant's credibility, including the levels of medication and their effectiveness, the extensiveness of the attempts ... to obtain relief, the frequency of medical contacts, the nature of daily activities, subjective measures of credibility that are peculiarly within the judgment of the ALJ ... and the consistency or compatibility of nonmedical testimony with objective medical evidence.

Kepler v. Chater, 68 F.3d 387, 391 (10th Cir. 1995); see 20 C.F.R. §§ 404.1529(c)(3), 416.929(c)(3).

In this case, the ALJ did not "find claimant fully credible regarding her limitations … the record documents over a lengthy period of time that claimant's seizures are well-controlled with medication. Accordingly, the [ALJ] finds claimant is more than capable of performing the range of work set forth herein." (Tr. 21). The ALJ also observed the findings of the state agency

---

[4] SSR 16-3P was issued after the date of the ALJ's decision in this case. However, the two-step process substantially restates the prior two-step process set forth in SSR 96-7, which was characterized by the Tenth Circuit as a three-step process set forth in Luna v. Bowen, 834 F.2d 161, 163-64 (10th Cir. 1987), the seminal case regarding credibility followed in the Tenth Circuit. See, e.g., Keyes-Zachary, 695 F.3d at 1166-67.

physicians were consistent with the RFC, and the state agency physicians found she could adapt to a work environment. (Tr. 20). Therefore, the ALJ appropriately considered and weighed the medical opinion evidence, in addition to finding Plaintiff's allegations of disabling limitations not credible, and the findings were supported by substantial evidence. The Court is not to disturb an ALJ's credibility findings if they are supported by substantial evidence because "[c]redibility determinations are peculiarly the province of the finder of fact." Cowan v. Astrue, 552 F.3d 1182, 1190 (10th Cir. 2008) (quoting Kepler, 68 F.3d at 391). Plaintiff fails to demonstrate how any alleged error would have changed the outcome of the case. See Sanders, 556 U.S. at 409-10. Based on the foregoing, substantial evidence supports the ALJ's credibility determination. See SSR 96-7p; 20 C.F.R. §§ 404.1529, 416.929.

Therefore, the record provided substantial evidence to support the ALJ's decision. It is not the reviewing court's position to reweigh the evidence or substitute judgment. As the Tenth Circuit has explained:

> "In reviewing the ALJ's decision, we neither reweigh the evidence nor substitute our judgment for that of the agency." Branum v. Barnhart, 385 F.3d 1268, 1270 (10th Cir. 2004). Rather, we examine the record as a whole to ascertain whether the ALJ's decision to grant benefits for a closed period, and to deny benefits thereafter, is supported by substantial evidence and adheres to the correct legal standards. See Shepherd v. Apfel, 184 F.3d 1196, 1199 (10th Cir. 1999). "Substantial evidence is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." Lax v. Astrue, 489 F.3d 1080, 1084 (10th Cir. 2007). It is "more than a scintilla, but less than a preponderance." Id.

Newbold v. Colvin, 718 F.3d 1257, 1262 (10th Cir. 2013). Accordingly, the decision provides substantial evidence a reasonable mind might accept as adequate to support the ALJ's conclusion Plaintiff could perform a significant number of jobs in the national economy.

## RECOMMENDATION

For the reasons set forth above, the undersigned **RECOMMENDS** to **DENY** Plaintiff's appeal and **AFFIRM** the Commissioner's decision in this case.

**OBJECTION**

In accordance with 28 U.S.C. § 636(b) and Federal Rule of Civil Procedure 72(b)(2), a party may file specific written objections to this report and recommendation. Such specific written objections must be filed with the Clerk of the District Court for the Northern District of Oklahoma within fourteen days, no later than July 9, 2018.

If specific written objections are timely filed, Federal Rule of Civil Procedure 72(b)(3) directs the district judge to

> determine *de novo* any part of the magistrate judge's disposition to which a party has properly objected. The district judge may accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the magistrate judge with instructions.

Id.; see also 28 U.S.C. § 636(b)(1). The Tenth Circuit has adopted a "firm waiver rule" which "provides that the failure to make timely objections to the magistrate's findings or recommendations waives appellate review of both factual and legal questions." United States v. One Parcel of Real Property, 73 F.3d 1057, 1059 (10th Cir. 1996) (quoting Moore v. United States, 950 F.2d 656, 659 (10th Cir. 1991)). Only a timely specific objection will preserve an issue for *de novo* review by the district court or for appellate review.

SUBMITTED on June 25, 2018.

**Gerald B. Cohn**
**United States Magistrate Judge**